IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LEON D. FORD,                           )
                    Plaintiff,          )
                                        )
        vs.                             )    Civil Action No. 13-1364
                                        )    Chief Magistrate Judge Maureen P. Kelly
CITY OF PITTSBURGH; POLICE              )
OFFICER DAVID DERBISH; POLICE           )
OFFICER MICHAEL KOSKO *and*             )
POLICE OFFICER ANDREW MILLER,           )
                    Defendants.         )
                                        )
POLICE OFFICER DAVID DERBISH;           )
POLICE OFFICER MICHAEL KOSKO            )
*and* POLICE OFFICER ANDREW             )    Re: ECF Nos. 180 and 183
MILLER,                                 )
            Cross-Claim Plaintiffs,     )
                                        )
        vs.                             )
                                        )
CITY OF PITTSBURGH,                     )
            Cross-Claim Defendant.      )

## OPINION

**KELLY, Chief Magistrate Judge**

Presently before the Court are two Motions for Summary Judgment: one filed by Defendants Police Officer David Derbish ("Derbish"), Police Officer Michael Kosko ("Kosko") and Police Officer Andrew Miller ("Miller") (collectively, "the Officers"), ECF No. 180, and one filed by Defendant City of Pittsburgh ("the City"), ECF No. 183. For the reasons that follow, the Officers' Motion for Summary Judgment, ECF No. 180, will be granted in part and denied in part. The City's Motion for Summary Judgment, ECF No. 183, will be granted.

## I.    PROCEDURAL BACKGROUND

In the operative Complaint, ECF No. 34, Plaintiff Leon D. Ford ("Plaintiff") raises federal and state claims related to a traffic stop of Plaintiff by Defendants Kosko and Miller which resulted in Plaintiff being shot by Defendant Derbish.

The Officers filed their Motion for Summary Judgment on January 29, 2016, along with a Brief in Support and a Concise Statement of Material Facts. ECF Nos. 180-182. The City also filed its Motion for Summary Judgment, Brief in Support and Concise Statement of Material Facts on January 29, 2016. ECF Nos. 183-185.

Plaintiff filed two responses to the Motions for Summary Judgment and a single Brief in Opposition on February 26, 2016. ECF Nos. 188-190. Also, on February 26, 2016, Plaintiff filed a three-part Concise Statement of Material Facts. ECF Nos. 191-193.

On March 18, 2016, the Officers filed a Reply to Plaintiff's Response and a Brief in Support thereof. ECF Nos. 198-199. Also on March 18, 2016, the City filed a Reply to Plaintiff's Response. ECF No. 200. Additionally on March 18, 2016, the City and the Officers filed a Reply to Plaintiff's Concise Statement of Material Facts. ECF Nos. 201.

On April 1, 2016, Plaintiff filed Sur-Replies to: (1) the Officers' Reply to Plaintiff's Concise Statement of Material Facts, ECF No. 202; (2) the City's Reply to the Plaintiff's Concise Statement of Material Facts, ECF No. 203; (3) the Officers' Brief in Reply to Plaintiff's Brief in Opposition to the Motion for Summary Judgment, ECF No. 204; and (4) the City's Brief in Reply to Plaintiff's Brief in Opposition to the Motion for Summary Judgment, ECF No. 205.

The Motions for Summary Judgment are now ripe for review.

## II.    FACTS

On November 11, 2012, at approximately 9:33 p.m., Defendants Miller and Kosko effectuated a traffic stop of Plaintiff.[1]   ECF No. 182 ¶ 2; ECF No. 191 ¶ 23.   As soon as Defendant Kosko activated the lights of his police cruiser, Plaintiff immediately put on his turn signal and pulled over to the side of the street.[2]   ECF No. 201 ¶ 23.   Plaintiff provided to Defendant Kosko Plaintiff's driver's license, insurance card and registration documentation and Defendant Kosko returned to the police cruiser.   ECF No. 182 ¶ 3; ECF No. 191 ¶ 28; ECF No. 201 ¶ 28.   Defendant Kosko testified at his deposition that he ran "Leon Ford" through the Mobile Data Terminal.   ECF No. 192-6 at 24.   The "Leon Ford" search returned no criminal history.   Id.   Defendant Kosko then ran "L. Ford" through the Mobile Data Terminal and found a picture of Lamont Ford, who had an active warrant.   ECF No. 182 ¶ 4; ECF No. 191 ¶¶ 28, 30; ECF No. 192-6 at 24.   Defendant Miller subsequently viewed the photo of Lamont Ford.   ECF No. 182 ¶ 8; ECF No. 202 ¶ 8.   Lamont Ford, like Plaintiff, was a young African American male.[3]   ECF No. 182 ¶ 9; ECF No. 202 ¶ 9.   Although Defendant Miller had previous knowledge of and personal interactions with Lamont Ford,[4] nonetheless, Defendant Miller called Defendant Derbish, who also had prior interactions with Lamont Ford, to the scene from another location for help in determining Plaintiff's identity.   ECF No. 182 ¶ 10; ECF No. 191 ¶ 35; ECF No. 202 ¶ 10.   At the scene, Defendant Derbish observed the photos of Lamont Ford and Plaintiff and conveyed to Defendant Miller his belief that Plaintiff likely was Lamont Ford.   ECF No. 182

---

[1]  No officer body microphone recorded the interaction between Plaintiff and the Officers.   The dash cam of Defendants Kosko and Miller's cruiser did record video of the incident.   ECF No. 190, Exhibit S.
[2]  Defendants admit that this stop was not a "high risk traffic stop."   ECF No. 201 ¶ 38.
[3]  Plaintiff was nineteen years old at the time of the stop.   ECF No. 191 ¶ 18.
[4]  Defendant Miller testified that he had previously monitored Lamont Ford on social media, he had spoken with Lamont Ford multiple times on Mulford Street and he had seen Lamont Ford in the hospital.   ECF No. 182-5 at 3.

¶¶ 10-11; ECF No. 191 ¶ 37. Defendant Derbish did not go to Plaintiff's vehicle and observe Plaintiff before rendering his opinion. ECF No. 191 ¶ 37.

Plaintiff testified that, in a second encounter with Defendant Kosko, prior to Defendants Miller and Derbish's approach to the car, Defendant Kosko asked Plaintiff if he was Lamont Ford. ECF No. 192-4 at 60. Plaintiff denied he was Lamont Ford. Id. At some point, Kosko responded to Plaintiff by yelling, "Fuck you. You are fuckin lying to a cop." Id. at 61.

At approximately 9:46 p.m., Defendants Miller and Derbish approached Plaintiff's car, at which time Defendant Derbish went to the passenger side of the car. ECF No. 182 ¶ 13; ECF No. 202 ¶ 13.

It is undisputed that Defendant Miller did not observe any firearm or ammunition in Plaintiff's vehicle. ECF No. 201 ¶ 27. However, the Officers maintain that Defendant Derbish observed a bulge in Plaintiff's sweatpants at this time, which he pointed out to Defendant Miller. ECF No. 182 ¶¶ 14-15. Defendant Miller then decided to pat Plaintiff down outside of the vehicle. Id. at ¶ 15.

At approximately 9:48 p.m., Defendant Kosko opened Plaintiff's door. ECF No. 191 ¶ 40; ECF No. 201 ¶ 41. The Officers verbally communicated their desire for Plaintiff to get out of the car.[5] ECF No. 182 ¶ 17; ECF No. 202 ¶ 17. Plaintiff remained in the car, anchoring his hand on the gear shift. ECF No. 182 ¶¶ 17-18; ECF No. 202 ¶ 18; ECF No. 205-2 at 81. Defendant Miller attempted to physically pull Plaintiff from the car. ECF No. 182 ¶ 18; ECF No. 191 ¶ 41; ECF No. 201 ¶ 41. At approximately 9:49 p.m., Defendant Derbish climbed into

---

[5] The Officers maintain that Defendant Miller and Kosko asked Plaintiff to step out of the car several times. ECF No. 182 ¶ 17. Plaintiff maintains that the Officers never instructed him to exit the car, but instead told him, "you'll get your black ass out of the car if we want your black ass out of the car." ECF No. 191 ¶ 41; ECF No. 202 ¶ 17. Plaintiff testified that he was "terrified" and "scared" by these remarks and that the two Officers had become "aggressive and combative." ECF No. 192-4 at 68, 73-75.

4

Plaintiff's car from the passenger side.[6] ECF No. 182 ¶ 18; ECF No. 191 ¶ 41; ECF No. 201 ¶ 42. Mere seconds later, the car moved forward with Plaintiff and Defendant Derbish inside.[7] ECF No. 191 ¶ 42; ECF No. 201 ¶ 42. Mere seconds after the car started to move, Defendant Derbish shot Plaintiff multiple times, in rapid succession, stopping only when Plaintiff was slumped over the steering wheel. ECF No. 182 ¶ 20; ECF No. 191 ¶ 42. The car crashed into a set of stairs at a residence a few houses down the street from the location of the stop. ECF No. 182 ¶ 21; ECF No. 191 ¶ 42. Following the crash, no weapon was found on Plaintiff's person or in his vehicle. ECF No. 191 ¶ 44.

Plaintiff testified at his deposition that, as a result of the shooting by Defendant Derbish, three bullets entered his chest, one bullet entered his arm and one bullet entered his hip. ECF No. 205-3 at 4. Due to injuries sustained from the shooting, Plaintiff was hospitalized for months and underwent multiple surgeries. Id. at 10-11. His spine is completely severed at the T5 level and he suffers permanent paralysis. Id. at 12.

A Critical Incident Review Board ("CIRB") was appointed by Pittsburgh Police Chief Nathan E. Harper to review the shooting of Plaintiff. ECF No. 191 ¶ 56. The CIRB found that the Officers violated multiple policies and training standards. Id. ¶ 57; ECF No. 201 ¶ 57; ECF No. 193-6. The CIRB recommended that Defendants Kosko and Derbish receive discipline regarding numerous violations of General Order 69-1 (relating to Mobile Video/Audio Recording equipment). ECF No. 193-6 at 10. The CIRB further recommended that Defendants Kosko and Miller receive remedial training concerning General Order 40-4.9 (relating to the quick, effective and efficient nature of motor vehicle stops). Id. Finally, the CIRB recommended that Office Derbish receive discipline concerning violations of General Order 40-

---

[6] It is undisputed that Defendant Derbish entered Plaintiff's vehicle while it was still running. ECF No. 199 at 5.
[7] Defendant Derbish testified that he was uncertain what caused the vehicle to move forward. ECF No. 191-10 at 13. Plaintiff testified that he does not know how the vehicle moved forward. ECF No. 192-4 at 90.

5

4.4 (relating to the prohibition on reaching into a running vehicle of a suspect) and General Order 12-7-4.0 (relating to discharge of a firearm at a moving vehicle). Id.

As a result of the incident, Plaintiff was criminally charged with two counts of aggravated assault, three counts of recklessly endangering another person, one count each of resisting arrest and escape and Motor Vehicle Code violations. Commonwealth v. Ford, CP-02-CR-0003273-2013 (Allegheny County Com. Pl.), available at http://ujsportal.pacourts.us/. Following a trial, Plaintiff was found not guilty of the aggravated assault charges. Id. The jury was hung on the charges of recklessly endangering another person, resisting arrest and escape and those charges were later nolle prossed by the Allegheny County District Attorney. Id. Plaintiff was convicted of two Motor Vehicle Code violations for summary traffic offenses. Id.

III. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment ""if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015) (internal citations and quotation marks omitted). Therefore, in order to defeat a motion for summary judgment, the non-movant must establish that the disputes are both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "At the summary judgment stage of proceedings, courts do not 'weigh the evidence or make credibility determinations,' but, instead, leave that task to the fact-finder at a later trial if the court denies summary judgment." Halsey v. Pfeiffer, 750 F.3d 273 (3d Cir. 2014) (quoting Petruzzi's IGA Supermarkets v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993)).

## IV. DISCUSSION

### A. Motion for Summary Judgment filed by Defendants Derbish, Kosko and Miller

Plaintiff brings multiple claims against the Officers in the Complaint. ECF No. 34. The claims generally may be grouped as follows: (1) Counts I and II, against all three of the Officers, concern violations of Plaintiff's rights guaranteed to him under the Fourth and Fourteenth[8] Amendments to the United States Constitution, (2) Counts IV (against Defendant Derbish), V (against Defendant Kosko) and VI (against Defendant Miller) are state law claims of assault and battery; and (3) Counts VII (against Defendant Derbish), VIII (against Defendant Kosko) and IX (against Defendant Miller) are claims of false arrest and imprisonment.

In their Motion for Summary Judgment, ECF No. 180, the Officers assert that they are entitled to judgment as a matter of law on multiple bases which will be addressed in turn.

---

[8] Technically, the Fourth Amendment applies to state actors, as the Officers herein are, by means of the Fourteenth Amendment and the selective incorporation doctrine. Knox County Educ. Ass'n v. Knox County Bd. of Educ., 158 F.3d 361, 371 n.9 (6th Cir. 1998) The phrase "Fourth Amendment" is herein used as a shorthand way of expressing the concept that the Fourth Amendment standards are applicable herein as incorporated into the substantive due process clause of the Fourteenth Amendment.

7

## 1. Qualified immunity

At the outset of their Motion for Summary Judgment and Brief in Support, the Officers first argue that they are entitled to judgment as a matter of law based on the qualified immunity doctrine. ECF No. 180 ¶ 5; ECF No. 181 at 3.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The United States Supreme Court has set forth a two-step objective reasonableness test to determine whether qualified immunity should be granted. Saucier v. Katz, 533 U.S. 194, 200-01 (2001); see also Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004). "First, the court must consider whether the facts alleged, taken in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right." Kopec, 361 F.3d at 776 (citing Saucier, 533 U.S. at 201). If "'a violation could be made out on a favorable view of the parties' submissions," the court must determine "'whether the right was clearly established.'" Id. (quoting Saucier, 533 U.S. at 201). "'The relevant dispositive inquiry' in making this determination is 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Id. (quoting Saucier, 533 U.S. at 202).

In this case, the Officers' argument for qualified immunity purports to be based on facts as seen in the light most favorable to Plaintiff. ECF No. 181 at 9. It is not. A thorough review of the summary judgment filings by the Officers reveals that their argument for qualified immunity is based on disputed facts, *e.g.*, the uncertainty over Plaintiff's identity, the observance of a bulge in Plaintiff's sweatpants and other critical facts, viewed in the light *least* favorable to Plaintiff. Id.

Viewing the facts in the light most favorable to Plaintiff, as is proper to undergo the first step outlined above in Saucier, the Court finds that the jury could conclude that the Officers used excessive force[9] against Plaintiff. The facts presented in the record do not clearly establish that every reasonable officer would have used the level of force employed by the Officers in the traffic stop, shooting and arrest of Plaintiff.

The second step outlined above requires a determination of "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." Kopec, 361 F.3d at 776 (citing Saucier, 533 U.S. at 202). "In other words, there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited." Mammaro v. N.J. Div. of Child Prot. and Permanency, 814 F.3d 164, 169 (3d Cir. 2016) (citing McLaughlin v. Watson, 271 F.3d 566, 572 (3d Cir. 2001)).

Here, the Officers claim that they are entitled to qualified immunity because the Officers "acted reasonably in response to the circumstances surrounding the incident." ECF No. 181 at 3.[10] However, the Officers concede that "there is no case law notifying the Defendants that their actions would result in the violation of an individual's rights and putting such a notice beyond debate." Id. at 4. See also ECF No. 180 ¶ 5.

In this context, the United States Court of Appeals for the Third Circuit has interpreted the second factor broadly. Kopec, 361 F.3d at 778 (quoting Burns v. County of Cambria, 971

---

[9] The legal principles relevant to excessive force are discussed *infra.*

[10] The Officers cite to the decision of the United States Supreme Court in Plumhoff v. Rickard, 134 S. Ct. 2012 (2014), ECF No. 181 at 6. However, the facts that supported a finding of qualified immunity in that case are very different and thus distinguishable from those in the instant case. In Plumhoff, the driver led police on a chase in which speeds exceeded 100 miles per hour that lasted more than 5 minutes and included the passing of more than two dozen other motorists, as well as the driver going through a "rolling roadblock" on I-40. 134 S. Ct. at 2017-18. When the driver was temporarily halted by colliding with a police cruiser in a parking lot, the driver made contact with another police cruiser, spun his tires and fled down another street at which point police officers fired shots at the driver. Id.

F.2d 1015, 1024 (3d Cir. 1992)). If no case directly speaks to the legality of the officers' conduct, the challenged conduct would need to be such that "reasonable officers in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct was lawful." Giuffre v. Bissell, 31 F.3d 1241, 1255 (3d Cir. 1994) (quoting Good v. Dauphin Cty. Social Servs. for Children & Youth, 891 F.2d 1087, 1092 (3d Cir. 1989)). "Reasonableness under the second factor [of the qualified immunity analysis] is an issue of law for the district court to determine; however, if there are facts material to the determination of reasonableness in dispute, then that issue of fact should be decided by the jury." Barton v. Curtis, 497 F.3d 331, 335 (3d Cir. 2007) (citing Sharrar v. Felsing, 128 F.3d 810, 826-28, 832 (3d Cir.1997) (citation omitted)).

In the instant case, there are multiple facts material to the determination of reasonableness that remain in dispute, including, but not limited to: (1) the nature of Plaintiff's conduct resulting in the traffic stop; (2) whether Plaintiff posed any threat during the traffic stop; (3) why the Officers continued to detain Plaintiff after his identity was confirmed; (4) whether there was a bulge in Plaintiff's pants; (5) why Defendant Derbish climbed into Plaintiff's vehicle in violation of the Pittsburgh Bureau of Police General Orders; and (6) what caused Plaintiff's vehicle to move forward. These disputes should be resolved by a jury, not the Court.

Because resolution of these issues implicates "disputes over facts that might affect the outcome of the suit under the governing law," Anderson, 477 U.S. at 248, the entry of summary judgment on qualified immunity is not appropriate at this time.[11] As such, the Officers are not entitled to summary judgment as a matter of law on this issue.

---

[11] See Barnes v. Edwards, Civ. A. 13-4239, 2016 U.S. Dist. LEXIS 82343, at *5 (D.N.J. June 24, 2016) (denying summary judgment on qualified immunity because factual disputes remained regarding reasonableness of defendants' conduct during arrest); Garey v. Borough of Quakertown, Civ. A. No. 12-799, 2013 U.S Dist. LEXIS 91798, at *15-16 (E.D. Pa. Jul. 1, 2013) (denying summary judgment on qualified immunity defense because factual

## 2. Unreasonable seizure (Counts I and II)

In Counts I and II of the Complaint, Plaintiff asserts that the Officers violated his rights guaranteed to him under the Fourth and Fourteenth Amendments, including the right to body integrity, the right to be free from excessive use of force and the right to be free from unreasonable searches and seizures. ECF No. 34 ¶¶ 57-64.

In describing his unlawful seizure claim in the Brief in Opposition to the Defendants' Motions for Summary Judgment, Plaintiff specifically identifies two "seizures" by the Officers: (1) when he was stopped; and (2) when he was shot. ECF No. 190 at 20. The Officers assert that Plaintiff has failed to produce sufficient evidence that he was subject to an unlawful seizure in either context.

A seizure triggering the Fourth Amendment's protections occurs when a government actor, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . .." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968).

### a. Traffic stop

The United States Supreme Court has recognized that a traffic stop is a "seizure" within the meaning of the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief." Delaware v. Prouse, 440 U.S. 648, 653 (1979); see also Whren v. United States, 517 U.S. 806, 809-10 (1996) ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'. . ..").

---

disputes about reasonableness of officer's conduct remained); Shultz v. Carlisle Police Dep't, 706 F.Supp.2d 613, 624 (M.D. Pa. 2010) (denying summary judgment on qualified immunity because factual disputes remained about whether a reasonable officer would have acted the same way); Wilhere v. Delaware Cnty., Civ. A. No. 09-22, 2010 U.S. Dist. LEXIS 31896, at *20-21 (E.D. Pa. Apr. 1, 2010) (denying summary judgment on qualified immunity defense because factual disputes remained about reasonableness of officer's conduct); Reynolds v. Smythe, 418 F.Supp.2d 724, 735 (E.D. Pa. 2006) (denying summary judgment on qualified immunity because factual disputes remained about how the actual incident occurred).

11

In the instant case, the Officers assert that Defendants Miller and Kosko were justified in executing the traffic stop of Plaintiff based on his travel at a high rate of speed and his failure to come to a complete stop at multiple stop signs.[12] ECF No. 181 at 12. In support of their argument, the Officers cite to the dash cam video from Defendants Miller and Kosko's cruiser. Id. Also citing the dash cam video, Plaintiff alleges that he was "not speeding, abiding by all posted road signs, and traveling in a safe and cautious manner." ECF No. 190 at 21. A review of the dash cam video, id., Exhibit S, shows that Plaintiff may have failed to come to a complete stop at a stop sign immediately prior to the traffic stop. Accordingly, the traffic stop was not unjustified in the manner that Plaintiff claims. See U.S. v. Mosley, 454 F.3d 249, 252 (3d Cir. 2006) (explaining that any technical violation of a traffic code legitimizes a stop even where stop is pretextual).[13]

Further, Plaintiff was convicted in the Court of Common Pleas of Allegheny County of a violation of 75 Pa. Cons. Stat. § 3323. The trial court docket indicates that Plaintiff was convicted of violating Section 3323(c), failure to comply with yield signs, but on appeal, the Pennsylvania Superior Court found that Plaintiff was effectively convicted of Section 3323(b), failure to comply with stop sign. Commonwealth v. Ford, No. 1669 WDA 2014, 2016 Pa. Super. LEXIS 319 at *7-8.[14] The Superior Court further held that sufficient evidence existed to establish that Plaintiff failed to stop at a stop sign. Id. at *18. A plaintiff cannot recover damages pursuant to a Section 1983 civil rights claim for harm caused by actions whose

---

[12] Defendant Derbish was not present for the initial traffic stop, so on this ground alone, he is entitled to summary judgment as to this portion of the unreasonable seizure claim.

[13] It is noted that both Plaintiff and the Officers refer to the length of the traffic stop and the reasons therefor in the context of this issue. However, Plaintiff does not claim that there was a separate or additional seizure between the stop and the shooting.

[14] On July 12, 2016, Plaintiff filed a Petition for Allowance of Appeal of the Superior Court's decision in the Pennsylvania Supreme Court.

12

unlawfulness would render a conviction invalid unless the conviction has reversed or set aside by other means not relevant in this case. See Smith v. Holtz, 87 F.3d 108, 112 (3d Cir. 1996).

Because Plaintiff's conviction for failing to comply with a stop sign was upheld on appeal, he cannot in this litigation recover damages for harm caused by the stop on the basis that he did not fail to comply with a stop sign.

For these reasons, the Officers are entitled to judgment as a matter of law with respect to Plaintiff's claim under Counts I and II that the traffic stop constituted an unreasonable seizure.

### b. Shooting

Plaintiff characterizes the second portion of Counts I and II as a claim for unlawful seizure via the use of excessive force. ECF No. 190 at 20. "To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a "seizure" occurred and that it was unreasonable." Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999). The Officers assert that Defendant Derbish acted reasonably in using deadly force against Plaintiff.[15] ECF No. 181 at 19.

The United States Supreme Court has held:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. See Terry v. Ohio, supra, at 20-22. . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," Johnson v. Glick, 481 F. 2d [1028] at 1033 [(2d Cir. 1973)], violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.

---

[15] The Officers additionally discuss the reasonableness of attempting to remove Plaintiff from the vehicle. Plaintiff does not claim that the attempt to remove constituted a separate or additional seizure. Therefore, it is unnecessary for the Court to address this context.

> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. See Scott v. United States, 436 U.S. 128, 137-139 (1978); see also Terry v. Ohio, supra, at 21 (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard"). An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional. See Scott v. United States, supra, at 138, citing United States v. Robinson, 414 U.S. 218 (1973).

Graham v. Connor, 490 U.S. 386, 396-97 (1989).

Plaintiff and the Officers set forth their respective versions of the circumstances surrounding the use of deadly force by Defendant Derbish. ECF No. 181 at 19; ECF No. 190 at 25. The Officers' version, again, does not reflect the facts viewed in the light most favorable to Plaintiff because it cites as true the uncertainty over Plaintiff's identity, the observance of a bulge in Plaintiff's sweatpants and Plaintiff's act of "fleeing." ECF No. 181 at 19. These facts are disputed.

Because Defendant Derbish is the sole defendant alleged to have effectuated this specific seizure, the claim can only proceed against him. Defendants Kosko and Miller are entitled to judgment as a matter of law as to Counts I and II as they relate to the shooting of Plaintiff constituting an unreasonable seizure.

As to the conduct of Defendant Derbish, in light of the disputed facts relative to the reasonableness of his actions and resolving all factual disputes in favor of Plaintiff, summary judgment is not appropriate because there is evidence which, if believed, could contradict the Officers' testimony and convince a factfinder that Defendant Derbish acted unreasonably. Accordingly, summary judgment is denied as to the claim against Defendant Derbish in Counts I and II as it relates to his shooting of Plaintiff.

14

### 3. Assault and battery (Counts IV, V and VI)

In the operative Complaint, Plaintiff asserts the following claims of assault and battery:
(1) Count IV against Defendant Derbish for shooting Plaintiff, ECF No. 34 ¶ 87; (2) Count V against Defendant Kosko for attempting to drag Plaintiff from his vehicle, id. ¶ 91; and (3) Count VI against Defendant Miller for attempting to drag Plaintiff from his vehicle, id. ¶ 95.[16]

The United States Court of Appeals for the Third Circuit has explained:

> The tort of assault is defined as "an intentional attempt by force to do any injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person."

Essex Ins. Co. v. Starlight Mgt. Co., 198 Fed. App'x 179, 183 (3d Cir. 2006) (quoting Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994)). Further, "[a] police officer may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty" as well as force necessary under the circumstances to effectuate a lawful arrest. Renk, 641 A.2d at 293. "The reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery." Id.

In moving for summary judgment, the Officers assert that Plaintiff failed to produce sufficient evidence to support his claims of assault and battery. ECF No. 181 at 23-25. Generally, the Officers argue that the force used against Plaintiff was reasonable and necessary. Specifically, the Officers argue that Plaintiff has produced no evidence that: (1) Defendant Kosko touched Plaintiff until he removed him from the vehicle and handcuffed him after the shooting; (2) Defendant Miller acted with intent to harm or actually harmed Plaintiff when he

---

[16] As to each of these Counts, in addition to the acts specified to constitute assault and battery, Plaintiff inserts a paragraph concerning the named officer's failure to render aid or assistance to Plaintiff after the shooting. ECF No. 34 ¶¶ 88, 92, 96. In responding to the Motion for Summary Judgment, Plaintiff fails to address the significance of this conduct in the context of his assault and battery claims.

15

attempted to pull him out of the car; and (3) Defendant Derbish did not act in self-defense when he shot Plaintiff. ECF No. 181 at 24.

In response, Plaintiff asserts that disputes of material facts exist concerning the reasonableness of the Officers' use of force. ECF No. 190 at 41. Indeed, while Plaintiff fails to specifically identify any of the factual disputes to which he refers, even a cursory review of the facts as offered by the parties, in the context of the totality of the circumstances, reveals disputes of material fact as to the reasonableness of the force used by Defendant Miller in his act of attempting to pull Plaintiff out of the car and by Defendant Derbish in his act of shooting Plaintiff. Accordingly, Defendants Miller and Derbish are not entitled to judgment as a matter of law on Counts IV and VI.

However, a review of the evidence advanced by Plaintiff to support the claim set forth in the Complaint against Defendant Kosko and his attempt to drag Plaintiff from his vehicle reveals a complete failure of proof. Plaintiff cites to an exchange at his criminal trial, ECF No. 191 ¶ 41 (citing ECF No. 192-5 at 26, lines 12-14), in which he is asked: "Now, at some point you remember getting yanked; and you said the car was rocking back and forth?" Plaintiff answers affirmatively. Id. The testimony does not identify Defendant Kosko as the person who yanked Plaintiff or who rocked the car. The dash cam footage also cited by Plaintiff, ECF No. 191, Exhibit S, at 21:49:14, shows Defendant Miller alone reaching into the car with a yanking motion which appears to cause the car to rock. Accordingly, because Plaintiff has failed to produce evidence to support his claim for assault and battery against Defendant Kosko, he is entitled to judgment as a matter of law for Count V.

16

### 4. False arrest and false imprisonment (Counts VII, VIII and IX)

Finally, the Officers assert that Plaintiff failed to produce sufficient evidence to support his claims of false arrest and false imprisonment.[17] ECF No. 181 at 19-23.

An arrest is unlawful if is not based upon probable cause. Reedy v. Evanson, 615 F.3d 197, 211 (3d Cir. 2010); Renk, 641 A.2d at 293. Plaintiff asserts that there was no probable cause to stop him and that no probable cause developed at any time in the incident. ECF No. 190 at 38-39. He additionally argues that he was charged based on false statements provided by the Officers. ECF No. 204 at 6-7.

Following the traffic stop and shooting, Plaintiff was arrested pursuant to a warrant obtained by Pittsburgh Police Detective Robert Provident on November 14, 2012, for two counts of aggravated assault, three counts of recklessly endangering another person, two counts of failure to yield at a yield sign and reckless driving. ECF No. 182 ¶ 23; ECF No. 202 ¶ 23. If probable cause existed as to any of these offenses, no liability for false arrest can attach. See Johnson v. Knorr, 477 F.3d 75, 84-85 (3d Cir. 2007). Further, conviction of an offense establishes as a matter of law that the arrest was supported by probable cause. Shelley v. Wilson, 339 Fed. App'x 136, 139 (3d Cir. 2009) (citing McClam v. Barry, 697 F.2d 366, 370 (D.C. Cir. 1983) (stating that for false arrest claims pursuant to common law and constitutional law, subsequent conviction establishes justification for arrest as a matter of law.))

Subsequent to the subject incident of this case, Plaintiff was arrested for and convicted of

---

[17] The Complaint indicates that Plaintiff is pursuing a constitutional claim for false arrest, ECF No. 34 ¶ 99. Now, Plaintiff indicates that the false arrest claim is a state law tort. ECF No. 205 at 6 ("the only torts that the Plaintiff ha[s] alleged against the Defendant officers are assault and battery and false arrest.") The elements for both types of false arrest claims are the same. Campeggio v. Upper Pottsgrove Twp., Civ. A. No. 14-1286, 2014 U.S. Dist. LEXIS 125644, *14-15 (E.D. Pa. Sept. 8, 2014) (citing Patzig v. O'Neil, 577 F.2d 84, 850 n.9 (3d Cir. 1978)). In Pennsylvania, claims of false arrest and false imprisonment are coextensive. Safa v. City of Phila., Civ. A. No. 2:13-cv-5007-DS, 2015 U.S. Dist. LEXIS 70022, *37 n.18 (E.D. Pa. May 29, 2015).

violating the Motor Vehicle Code at 75 Pa. Cons. Stat. § 3323.[18] That conviction was upheld on appeal. Ford, 2016 Pa. Super. LEXIS 319. Even though the conviction was for a summary traffic offense, the conviction establishes probable cause for his arrest as a matter of law, thus rendering his arrest lawful.

Accordingly, the Officers are entitled to judgment as a matter of law on Counts VII, VIII and IX.

## B. Motion for Summary Judgment filed by Defendant City of Pittsburgh (Count III)

Plaintiff's sole claim against the City is set forth in Count III of the Complaint, entitled

"Failure to Train, Enact and Imple[]ment Policies and Procedures and to Supervise Properly."

ECF No. 34 at 18. Therein, Plaintiff alleges:

> The failure by the City of Pittsburgh to ensure that the established policies and procedures found in the Pittsburgh Bureau of Police Order were being followed by all Officers during the discharge of their official duties rendered the policies and procedures "window dressing," and demonstrates a deliberate indifference by the City of Pittsburgh Police Department to thwart the custom or practice of officers' noncompliance of the Order, and therein resulting in the violation of the constitutional rights ensured to the citizens of the City of Pittsburgh, such as the Plaintiff . . ..

Id. ¶ 82. Plaintiff alleges that his constitutional rights that were violated by the City include: "the right to body integrity," "the right to be free from the use of excessive force" and "the right to be free from unreasonable seizures and searches." Id. ¶ 72.

Following discovery, and in response to the City's Motion for Summary Judgment, Plaintiff summarizes his claim against the City as follows:

> ... The City of Pittsburgh Police Department has in place **defective and unlawful use of force policies and practices**. Those policies, along with the closed, insular structure of leadership fostered by **cronyism**, enabled "**fishing**," and widespread **non compliance of the Department's General**

---

[18] The unusual history of the applicable subsection is detailed above.

**Orders**, including misuse of the MVR Equipment that went undisciplined....

ECF No. 190 at 4 (emphasis added).

Plaintiff's claim against the City is based on liability as set forth in <u>Monell v. Department</u>

<u>of Social Services of the City of New York</u>:

> Local governing bodies ... can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

436 U.S. 658, 690-91 (1978).[19]

The City first argues that Plaintiff cannot establish any violation of his constitutional rights by the Officers. ECF No. 184 at 3-5. As discussed above, in the analysis of the Officers' Motion for Summary Judgment, a jury question concerning the violation of Plaintiff's constitutional right to be free from unlawful seizure by excessive force remains. Accordingly, the City cannot obtain judgment as a matter of law on this basis.

The City next argues that Plaintiff cannot establish that he suffered a violation of his constitutional rights by the City as a result of the identified municipal policy and customs. Id. at 6-25. In his "Counter Concise Statement of Material Facts in Support of Plaintiff's Opposition

---

[19] In order to succeed on a Section 1983 claim, a claimant must show: (1) the conduct complained of was performed by a person acting under color of state law; and (2) this conduct deprived the claimant of rights, privileges, or immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; <u>Kost v. Kozakiewicz</u>, 1 F.3d 176, 184 (3d Cir. 1993).

19

to Defendants' Motions for Summary Judgment,"[20] Plaintiff sets forth approximately sixteen "facts" to establish the existence of the City's policy and customs that resulted in constitutional violations. ECF No. 191 ¶¶ 1-16.

One of these "facts," Paragraph 16, is wholly unsupported by citation to the record.[21] It will not be considered. The other "facts" referenced by Plaintiff include a significant number of non-factual, non-supported statements. See, e.g., id. ¶ 8 (no citation for "It's important to note that David Wright is a hyper-physical, overly muscular, former wrestler, who prides himself on physical fitness and fighting technique.") Such unsupported statements will not be considered. Finally, these sixteen "facts" listed by Plaintiff often contain citations which are inaccurate. In Paragraphs 8 and 9, for example, which are purported to be illustrations of the flawed training at the Pittsburgh Police Training Academy, the sole supportive citations are to excerpts of the transcript of the deposition of David Wright, an instructor at the Academy. However, none of

---

[20] The Court notes that Plaintiff's "Counter Concise Statement of Material Facts in Support of Plaintiff's Opposition to Defendants' Motions for Summary Judgment," ECF No. 191, is not compliant with LCvR 56(C)(1), which requires "A Responsive Concise Statement" "which responds to each numbered paragraph in the moving party's Concise Statement of Material Facts." The City and the Officers objected to the Counter Concise Statement on this basis, correctly stating that such non-compliance "needlessly adds to the work facing the parties and the Court." ECF No. 201 at 1. In response to the Defendants' objection, "in an abundance of caution," Plaintiff's counsel undertook "the rote exercise" of complying with the applicable Local Rule. ECF No. 202 at 2; ECF No. 203 at 2. Plaintiff's responses in the compliant pleading largely unnecessarily and unhelpfully refer to multiple paragraphs (as many as 51 at a time, see, e.g., ECF No. 202 ¶ 17) in his Counter Concise Statement. However, rather than reject Plaintiff's pleadings as improper, in order to expedite the disposition of the subject motions, the Court will entertain them to the extent they are otherwise compliant with applicable rules.

[21] Paragraph 16 provides:

> Thus, Officers Miller, Kosko, and Derbish, who were all officers in the new post-Consent Decree era, never received the proper training on cultural diversity, impartial bias, fishing, when to shoot, when not to shoot, or on de-escalation tactics. They were instructed not to follow G.O. 40-4, 4.4, because force by any means can always be justified. They were permitted to pick and choose when to comply with G.O. 69-1, which governs the proper use of the MVR equipment. They were allowed complete freedom to use whatever measure of force they deemed necessary without proper supervisory review, counseling, or discipline. They were encouraged to make stops, and search as many citizens as possible, regardless of the legality of their actions. In fact, they were lauded for such behavior through publications circulated throughout the police force. This atmosphere of aggressive officers quick to utilize physical force, with zero accountability for their behavior, became akin to a percolating pot that boiled over with the shooting of Leon Ford.

ECF No. 191 ¶ 16.

the excerpts cited therein correspond to the facts or the quotations set forth by Plaintiff's counsel.

For instance, Plaintiff states:

> Instead, David Wright, who is charged with the training of officers in accordance with the General Orders that dictate their behaviors throughout their careers, outright disagreed with this regulation, because in his opinion, "the policy could put an officer's life in jeopardy." David Wright Deposition, Ex. F, Pg. 48 lines 9-18.

ECF No. 191 ¶ 9. The citation provided is to the following testimony:

> A   Then we also have officers that are hired from – whether they have experience on the street or they have experience just at the academy, have been to another police academy within the Commonwealth.
> Q   And those that are, quote, unquote, off the street, did they receive any secondary advanced training around use of force like you received in Virginia?
> A   It is not broken down to – whereas, Virginia

ECF No. 191-6 at 6.

Obviously, neither the quotation nor the general topic can be found in the cited material. Although this error may be merely clerical, it is by no means isolated. The Court cannot expend its resources attempting to resolve and correct the numerous inaccuracies found throughout Plaintiff's Counter Concise Statement of Material Facts. Accordingly, because an inaccurate citation is no better than no citation, "facts" supported only by inaccurate citations will not be considered.

It should be noted that the Defendants pointed out the problems with the lack of citation as well as inaccurate citation in Plaintiff's Counter Concise Statement of Material Facts. ECF No. 201. Plaintiff's counsel took no responsive remedial action.

The Court now turns to the properly submitted facts concerning the four areas emphasized above that essentially form the bases of Plaintiff's claim against the City for failure to train, enact and implement policies and procedures and to properly supervise: (1) defective

21

and unlawful use of force training; (2) cronyism; (3) fishing; and (4) non-compliance with General Order 69-1.[22]

## 1. Use of force training

Plaintiff asserts that the Pittsburgh Police Training Academy had a "training gap," whereby "training on excessive force focused primarily on encouragement and tutelage of ways to use force, i.e., tactics and hand to hand combat techniques versus de-escalation and teaching a proper continuum of when to use appropriate force." ECF No. 190 at 13.

In general, municipalities are not liable for a failure to train their police officers except "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989). To amount to "deliberate indifference," the need for training must be "obvious," and the lack of training "so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id.

Monell liability can be predicated on the theory that the municipality's failure to train its employees "reflect[s] a deliberate or conscious choice by policymaking officials, such that one could call it the [municipality's] policy or custom." Grazier ex rel. White v. City of Phila., 328 F.3d 120, 124 (3d Cir. 2003). "[T]here are limited circumstances in which an allegation of failure to train can be the basis for liability under § 1983." City of Canton, 489 U.S. at 387. "[W]hen city policymakers are on actual or constructive notice that a particular omission in their

---

[22] Plaintiff also makes a general argument that the City experienced a "back sliding effect" following the 2002 lifting of a 1997 consent decree concerning a pattern of conduct by City of Pittsburgh Bureau of Police. See ECF No. 191 ¶¶ 1-3. However, in opposing the City's Motion for Summary Judgment, Plaintiff fails to point to even one other incident of citizen-police interaction in which the citizen's constitutional rights were violated, thus failing in this manner to establish a pattern of such violations. Furthermore, although Plaintiff advanced allegations in the operative Complaint of additional "example[s] of the City of Pittsburgh Police Department's blatant and continuous disregard for policy, particularly in the context of excessive and/or deadly force," ECF No. 34 ¶ 78, citing incidents involving citizens Jordan Miles, Will El, Beyshaud El and Dennis Henderson, id. ¶¶ 78-79, Plaintiff has not supported those allegations with any evidence in opposition to the Motion for Summary Judgment.

22

training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." Connick v. Thompson, 563 U.S. 51, 61 (2011). However, "[w]ithout notice that a training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Id. at 62. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Id. A plaintiff usually must provide evidence that the alleged failure to train has caused a "pattern of violations." Kelly v. Borough of Carlisle, 622 F.3d 248, 265 (3d Cir. 2010).

When a plaintiff can show no pattern of constitutional violations, there is only "a narrow range of circumstances" in which the need for training will be so obvious that deliberate indifference can be imputed to a municipality that fails to provide that training. Connick, 563 U.S. at 71-72.

A district court must look to: (1) whether the training program is adequate; and (2) whether any inadequate training "can justifiably be said to represent 'city policy.'" City of Canton, 489 U.S. at 390. In other words, a municipality will only be liable for inadequate training if, "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id. "Courts should be careful not to impose liability merely because municipal training *could* have been more thorough or comprehensive -- that question will almost always be answered in the affirmative. Rather the question is whether the training *should* have been more thorough or comprehensive, an inquiry that focuses on the deliberate indifference standard." Murray v. City of Philadelphia, Civ. A. No. 2:11-CV-6900-CDJ, 2014

23

U.S. Dist. LEXIS 104456, *10-11 (E.D. Pa. July 31, 2014) (citing City of Canton, 489 U.S. at

392) (emphasis in original).

In the instant case, Plaintiff does not argue that the City failed to train officers on the use

of force. Rather, Plaintiff claims that the use of force training focused too much on force

techniques and not enough on de-escalation techniques. Plaintiff relies on the testimony of two

witnesses as factual support for his allegation of deficient use of force training against the City.

First, Plaintiff cites the following excerpt of the deposition testimony of former

Pittsburgh Police Commander Rashall Brackney. ECF No. 191 ¶ 7.

> Q: Do you see any training gap in the training that Pittsburgh police
> officers are given regarding use of force or deadly force?
>
> A: Yes. I think we've gotten into the habit of focusing so much on
> physical skills training. And we give the canned response that we integrate
> customer service and deescalation, conflict resolution training in every
> aspect of every training that we do, that we talk about customer service, but
> is it really the way we feel about that?
>
> I can't speak for everybody. I just -- I just know there is a gap.
>
> For instance, about a year ago we went through four days of training on
> policing ethics. And I don't believe any of us taught any of the classes on
> ethics and policing.
>
> So I -- I believe we do a lot of our training so that we can check off a box
> around liability. And if everyone believes or thinks that's the perspective
> you're coming from, they're only there to check off the box, as well.

ECF No. 191-2 at 20-21.

Secondly, Plaintiff maintains that the training the City did provide concerning

"alternative techniques to the physical use of force, i.e., body language, eye contact, and verbal

judo," ECF No. 191 ¶ 10, was inherently ineffective because it was taught by David Wright, an

instructor "who is a staunch advocate of physical use of force, in all circumstances." Id. The

testimony from David Wright cited by Plaintiff does not support his characterization that Wright

24

advocates force in "all circumstances." Rather, therein Wright describes how he would react in one particular circumstance, namely "if you have a gun and you decide to use it on me," which he also describes as "close-quarter combat, which is you have a gun." ECF No. 191-8 at 4, 5. This testimony does not support Plaintiff's claim.

As such, Plaintiff is left with the Brackney deposition excerpt, which, at the very most, identifies a possible deficiency, *i.e.*, that the use of force training should have included additional de-escalation training. Construing all of the facts in the light most favorable to Plaintiff, he has failed to proffer any evidence identifying a City decisionmaker who was "on actual or constructive notice" of the alleged training deficiency, no evidence that the decisionmaker - despite such notice - chose to maintain an inadequate training program, and no evidence establishing that the City's training on use of force was the cause of Plaintiff's injuries. See Kelly v. Borough of Carlisle, 622 F.3d at 265; Pharaoh v. Dewees, Civ. A. No. 14-3116, 2016 U.S. Dist. LEXIS 59668, at *5 (E.D. Pa. May 4, 2016); Artiles v. Vitanza, Civ. A. No. 06-5427, 2009 U.S. Dist. LEXIS 68820, at *82-100 (D.N.J. Aug. 6, 2009).

Because Plaintiff has failed to make a showing sufficient to establish the existence of the requisite elements essential to a failure to train or deficient training claim, on which he will bear the burden at trial, the City is entitled to judgment as a matter of law on this claim. Therefore, Plaintiff may not proceed with his Monell claim against the City on the failure to adequately train claim.

## 2. Cronyism

The sole material evidence that Plaintiff cites concerning "cronyism"[23] is the following deposition testimony of Pittsburgh Police Commander Eric Holmes:

---

[23] Plaintiff defines "cronyism" as a practice whereby "higher ranking police officials advanced or hand selected their friends in the force to be placed in certain positions or earmarked them for advancement." ECF No. 191 ¶ 4.

Q And in addition to not being fair to the other officers, that also creates a risk to the society at large as far as overstepping people's rights on the street, the citizen's on the street?

A Potentially.

Q What I mean by that is, if they're all friends and they all back up each other's behaviors, if they overstep some grounds to do certain things, it's hard to believe that they would tell on each other or check each other -- check and balance each other?

A Yes.

Q And that's the fear of the cronyism in general, correct?

A Yes.

Q It could deteriorate pretty rapidly from the perspective of society?

A Yes.

Q That's what you're talking about keeping the integrity and professionalism of police is important to you, as well?

A Yes.

Q You agree with that, yes?

A I wasn't listening. I was zoning.

Q You agree that one of the risks of cronyism is that behavior of officers will be backed up by their friends, versus looked at objectively, correct?

A Yes.

ECF No. 191-3 at 11-12 (objection and recess omitted).

This testimony falls short of constituting evidence of the occurrence of any constitutional violation. Commander Holmes herein only speculates on the potential risks of and general fears concerning cronyism. He does not state that these risks or fears were realized in the Pittsburgh Bureau of Police. This testimony, in which every line of substance uses a hypothetical term (i.e., "risk," "if," "fear," "could"), is speculative on its face, and cannot constitute proof of any element of Plaintiff's case against the City.

### 3. Fishing

Plaintiff asserts that "fishing," "which involves officers stopping or encountering as many individuals as possible during a shift with the hope of making arrests," "became a common tool

Plaintiff cites testimony from Eric Holmes in support of this definition from Eric Holmes, id., but attaches only a part of that testimony. Plaintiff also cites testimony from Chief Cameron McLay in further support of this definition, id., but that testimony, "So there was a whole lot going on there. So I was able to get my handle or [sic] what had occurred. My analysis process also revealed as ...," ECF No. 191-4 at 7, is not supportive.

that Pittsburgh Police began to utilize." ECF No. 191 ¶ 11. Plaintiff further asserts that "in practice, fishing is nothing more than glamorized racial profiling, and undoubtedly results in an erosion of the constitutional rights amongst citizens in minority neighborhoods." Id.

The City seeks summary judgment on this claim on the grounds that Plaintiff has failed "to provide specific instances where this alleged practice caused the deprivation of a person's rights," let alone that it *directly* caused Plaintiff's alleged deprivation of rights following his traffic stop. ECF No. 200 at 7. The City further argues that, even under Plaintiff's theory, this practice is not unlawful. Id. At most, the City asserts that, "fishing" "may raise a public policy issue" but it is not grounds to avoid summary judgment on Plaintiff's municipal liability claim. Id.

Plaintiff supports his claim with deposition testimony from Pittsburgh Police Chief Cameron McLay describing fishing as "one of those lawful practices that have an impact on community trust because it appears disingenuous." Id. (citing ECF No. 191-4 at 2). He also cites to testimony from former Pittsburgh Police Chief Nathan Harper, id., which provides as follows:

> Q. I asked you, when we went off the record, did you ever hear of the term "fishing." You said that was a term that was used for decades?
> A. Yeah, decades.
> Q. What did you understand that to mean?
> A. That meant, on a vehicle stop, there is no probable cause for a vehicle stop, but officers going to hope that they find something, vehicle code violation.
> Q. And something that allows them to go further in searching. Correct?
> A. That's correct.
> Q. Maybe uncover narcotics or a gun or something?
> A. That's correct.
> Q. What do you think of that technique?
> A. I think it's a terrible technique, and I would not allow it.
> Q. Tell me why it's not a good technique or is a terrible technique.
> A. Because it's a violation of the person's civil rights.

27

Q. And you recognized the slippery slope it could involve once you start eroding those rights?

A. That's correct.

Q. You also recognize, largely, those practices are used in communities of color?

A. Yes.

ECF No. 191-9 at 7-8.

The sole testimony cited by Plaintiff that remotely connects the technique of fishing to City of Pittsburgh Bureau of Police in any manner comes from the deposition of Commander Eric Holmes. ECF No. 191 ¶ 10. In the cited testimony, Commander Holmes describes two possible rewards for Pittsburgh police officers who engage in fishing: (1) money, in the form of payment for court time; and (2) recognition on a list of police officers who have recovered illegal guns. ECF No. 191-3 at 16. In both of these areas, Commander Holmes was indefinite, testifying that court time could "potentially" lead to more money, depending on which shift the officer worked, id. at 16-17, and giving his "personal opinion" that the existence of the list "could lead to shoddy, shoddy police work," explaining that, "You're just trying to get your name on the list, so you just take short cuts." Id. at 19-20. In the cited testimony, Commander Holmes does not state that Pittsburgh police officers engaged in fishing or that the lawful practice thereof resulted in any violation of constitutional rights of Plaintiff.

The above-cited testimony generally recognizes the unacceptable technique of "fishing," but it does not establish any connection between fishing, the City of Pittsburgh Bureau of Police and the harm that Plaintiff sustained.

Accordingly, Plaintiff has not established that the Officers either practiced fishing in conducting the traffic stop, or, more importantly, that the practice of fishing by the Officers resulted in the violation of Plaintiff's constitutional rights.

### 4. Non-compliance with General Order 69-1

Finally, Plaintiff advances a claim that the Pittsburgh Police Officers failed to provide proper training for and enforcement of General Order 69-1, implemented on April 15, 2012, which established guidelines and procedures for use of Mobile Video/Audio Recording ("MVR") equipment. ECF No. 191 ¶ 13.

The City seeks summary judgment as to this portion of Plaintiff's claim as well. Specifically, the City argues that Plaintiff does not claim to have a constitutional right to be recorded with MVR equipment. ECF No. 200 at 9. Rather, the City notes that Plaintiff appears to be alleging that the failure to follow the MVR Order enabled a pattern of policy violations by police officers to go undetected by the City. Id.

General Order 69-1 expressly provides that police officers operating MVR-equipped vehicles "will ensure" recording of the certain types of incidents, including:

> 5.1.1. Traffic and criminal enforcement stops.
> 5.1.2. In-progress Vehicle and Crimes Code violations.
> 5.1.3. Police vehicle pursuits.
> 5.1.4. Patrol vehicle travel and movements when emergency lights or siren are activated.

ECF No. 191-11 at 3.

In considering the noncompliance/failure to train portion of Plaintiff's claim relative to General Order 69-1, it must be recognized that "a § 1983 plaintiff pressing a claim of this kind must identify a failure to provide specific training that has a causal nexus with his or her injury." Colburn v. Upper Darby Twp., 946 F.2d 1017, 1030 (3d Cir. 1991).

In supporting this claim, Plaintiff initially advances a statement that the training for this equipment was "woefully inadequate." ECF No. 191 ¶ 13. The cited testimony for that "fact" does not speak to the adequacy of the training. ECF No. 191-12 at 2. Rather, the cited

deposition testimony from Mark Kneebone[24] concerns the lack of immediate understanding on the part of the police officers about whether the MVR equipment would ultimately prove to be a benefit or a detriment to them. Id. Specifically, in response to a question about the "mind set" of the Pittsburgh Police Department towards the equipment and whether it would be "good for" them from the police perspective, Office Kneebone answered:

> I'm trying to think how to explain it to you. We got trained in cameras overnight. One day we came into work, they are like, "You have to go to this training, because we have cameras." So we didn't understand how it worked, how it was going to be utilized. So yes, there was [sic] questions about it, because we didn't know. But now that everybody knows how it works and they are comfortable with it now.

Id.

At most, this nonspecific testimony establishes that either prior to or immediately after the initial training on the MVR equipment, there may have been some lack of understanding on the scope of the use of the MVR equipment.

Plaintiff next advances the deposition testimony of several police officials to support his contention that "no training or discipline was meted out" to officers who were noncompliant with MVR policies. ECF No. 191 ¶ 14. Testimony from the cited depositions, in large part, directly contradicts Plaintiff's contention. In the excerpts of former Commander Brackney's deposition attached by Plaintiff, she offers the following testimony:

> Q Do you know if the City was doing anything as far as active training or discipline of the officers who were guilty of not using the equipment for 69-1?
>
> A I believe Chief Bryant, who is the Chief of Operations, reissued the order regarding our motor vehicles -- our MVR activation and officers were being counseled or retrained, so if they were --

---

[24] Plaintiff does not here identify Mark Kneebone. A non-cited portion of his deposition reveals that he was a Pittsburgh Police Officer working in Zone 5 with the Officers at the time of the shooting. ECF No. 205, Exhibit A, Mark Kneebone at 18.

> If that was -- during these validations each month, if that was determined, the officers were trained, as well.

ECF No. 191-2 at 15.

Former Chief Harper testified about MVR-related problems as follows:

> Q   And then, what was done to rectify the problem?
> A   Well, we would do a remedial training or, after remedial training, we initiated discipline action.

ECF No. 191-9 at 6.

There is cited testimony that may not directly contradict Plaintiff's assertion of fact from

the deposition Sergeant Michael Pilyih which is, in total, as follows:

> A.   I can't speak for them. But I can say that it was not widely enforced at our station yet.
> Q.   At Zone 5?
> A.   At Zone 5.

ECF No 192-1 at 2.

The subject of this testimony is not identified. No weight can therefore be assigned to it.

Further, Plaintiff cites to deposition testimony of Jennifer Ford, identified by Plaintiff as

"the Lieutenant of the Training Academy of the Pittsburgh Police Department," describing her

testimony as:

> Despite the importance of the equipment, the purpose behind it, and the valuable information it records, Lieutenant Ford never instituted appropriate retraining, never investigated why video was not accompanied with audio in **all instances**, and never determined whether the equipment was properly functioning.

ECF No. 191 ¶ 15 (emphasis in original).

The testimony of Lieutenant Ford cited for this proposition by Plaintiff is:

> Q   Okay.  So when you didn't know whether it was either in the malfunction of the equipment category or deliberate act, did it ever occur to you to, at some point, review some of those, we'll call them, I guess,

31

command -- control panels, to see what -- if it was malfunction or a deliberate act?

A    No, I didn't do those reviews.

ECF No. 192-2 at 8.

As the City points out, Plaintiff did not lay a foundation to establish that Lieutenant Ford had responsibility for any of the tasks listed. ECF No. 201 ¶ 15. Further, the cited testimony does not concern the issue of retraining for which it is cited.

Considering all of the evidence relative to training and compliance with the MVR equipment order in the light most favorable to Plaintiff, this Court finds that he has not established the causal connection between such training and compliance and the injuries at issue. Plaintiff has not made out a claim to the inadequacy of training on the equipment or enforcement of General Order 69-1.

* * * * *

In summary, following a thorough review, the Court finds that Plaintiff has failed to produce sufficient evidence, even when that evidence is construed in the light most favorable to him, to survive the City's Motion for Summary Judgment relative to Plaintiff's claims that his constitutional rights were violated by the City's alleged unlawful policies and practices. Therefore, the City is entitled to summary judgment.[25]

---

[25]    The City raises one additional argument, concerning the impropriety of punitive damages, in its Motion for Summary Judgment. ECF No. 183 ¶ 4. The Court need not address this issue.

## V.    CONCLUSION

The Motion for Summary Judgment filed by the Officers, ECF No. 180, is granted in part and denied in part.

As to qualified immunity, summary judgment is denied.

As to Counts I and II, summary judgment is granted in favor of Defendants Kosko and Miller. Summary judgment is granted in favor of Defendant Derbish for the portion of Counts I and II concerning the traffic stop. Summary Judgment as to Plaintiff's claim under Counts I and II that Defendant Derbish effectuated an unlawful seizure of Plaintiff by excessive force is denied and will proceed to trial.

As to Count IV, summary judgment is denied. The claim of assault and battery against Defendant Derbish will proceed to trial.

As to Count V, summary judgment is granted in favor of Defendant Kosko.

As to Count VI, summary judgment is denied. The claim of assault and battery against Defendant Miller will proceed to trial.

As to Count VII, summary judgment is granted in favor of Defendant Derbish.
As to Count VIII, summary judgment is granted in favor of Defendant Kosko.
As to Count IX, summary judgment is granted in favor of Defendant Miller.

The Motion for Summary Judgment filed by the City, ECF No. 183, is granted.

In accordance with these rulings, Defendant Kosko is dismissed from the case. The City of Pittsburgh is dismissed as a defendant.[26]

Dated: August 15, 2016

BY THE COURT,

MAUREEN P. KELLY
CHIEF UNITED STATES MAGISTRATE JUDGE

cc:    All Counsel of Record Via CM-ECF

---

[26] The City of Pittsburgh remains as a Cross-Claim Defendant.